## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**TEXTRON SYSTEMS CORPORATION,**

    *Plaintiff/Counter-Defendant,*

    **v.**                                                    **Civil No.: 1:23-cv-02828-JRR**

**BARZAN AERONAUTICAL LLC,**

    *Defendant/Counter-Plaintiff.*

### <u>MEMORANDUM OPINION</u>

Plaintiff Textron Systems Corporation ("Textron") initiated this breach of contract action against Defendant Barzan Aeronautical LLC (now SC Aeronautical LLC) ("SC Aero" or "Barzan").[1]  (ECF No. 1; the "Complaint.")  SC Aero then filed a counterclaim against Textron, asserting claims for breach of contract, breach of fiduciary duties, specific performance,[2] and unjust enrichment.  (ECF No. 15; the "Counterclaim").  Pending before the court is Textron's Motion for Judgment on the Pleadings and Motion to Dismiss Counterclaims or in the Alternative Motion for Summary Judgment, which seeks judgment on the pleadings as to its Complaint and dismissal of SC Aero's Counterclaim, or, alternatively, summary judgment as to its Complaint and SC Aero's Counterclaim.  (ECF No. 19; the "Motion.")  The court has reviewed all papers; no hearing is necessary.  Local Rule 105.6 (D. Md. 2023).  For the reasons that follow, by accompanying order, the Motion is granted in part and denied in part.

---

[1] In its corporate disclosure statement (ECF No. 10), SC Aero identifies itself as "SC Aeronautical LLC (f/k/a Barzan Aeronautical LLC).  For clarity, the court will use "Barzan" when referring to actions prior to initiation of this action and "SC Aero" when referring to actions after initiation of this action.

[2] SC Aero's specific performance claim is pled in the alternative: "In the event the November 22 letter is deemed enforceable against SC Aero, Textron is in breach of it and should be ordered to specifically perform its obligations thereunder."  (ECF No. 15 ¶ 52; *see also* the title to its specific performance claim, *id.* at 17, which reads: "Specific Performance (Alternatively).")

## I.   __BACKGROUND__[3]

On or around January 20, 2019, Textron and Barzan (now SC Aero) entered into a Master Relationship Agreement ("MRA") "to jointly pursue Intelligence, Surveillance, Reconnaissance (ISR) efforts (to include air vehicles, support equipment and services) in Qatar, Greece, Gibraltar, Italy (excluding the Italian Army) and Spain."  (ECF No. 22-2 at p. 1.)  The parties envisioned that the full scope of the MRA would be executed in three phrases.  *Id.*  The expectations for the first phase were memorialized on or about June 25, 2020, in the Phase 1 Contract, Contract No. BARZUAS5000 (ECF No. 19-1; "Phase 1 Contract"),[4] pursuant to which Textron agreed to build and test an unmanned aircraft system ("UAS") for Barzan.  (ECF No. 1 ¶ 9; ECF No. 15.)

The Phase 1 Contract is a "Cost-Plus Percentage of Cost, Fee Contract with fifteen percent (15%) fee"[5] in which the parties agreed as follows:

> (1) TEXTRON will contribute, at no cost, and utilize TEXTRON owned airframes to be used as engineering assets for the development of a Production Representative Air Vehicle that can be controlled by the TEXTRON Aerosonde Ground Control Station (GCS); and

> (2) TEXTRON will deliver to BARZAN a "Production Representative UAS PRODUCT" for their use; and

> (3) Upon Successful completion of Contract and final payment, TEXTRON will deliver to BARZAN license(s) for certain initial Intellectual Property as specified herein.

---

[3] For purposes of resolving the Motion, the court accepts as true all well-pled facts set forth in the Complaint and Counterclaim; however, it will not accept as true the allegations contained in SC Aero's Answer to the extent they are in conflict with the Complaint.  (ECF Nos. 15, 20.)  *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009); *see Al-Sabah v. World Bus. Lenders, LLC*, No. CV SAG-18-2958, 2020 WL 3868989, at *8 (D. Md. July 9, 2020) (noting that the court "may also accept as true factual allegations in the Answer[], but only where they do not contradict the allegations in the Complaint").

[4] Addressed more fully below, the court will consider exhibits that are integral to the Complaint (and, where relevant, the Counterclaim).

[5] The Appellate Court of Maryland defines a cost-plus contract as "one in which [a] contractor agrees to build the structure for the cost of the materials and labor, plus an agreed percentage of those costs as profit."  *Mayor & City Council of Ocean City v. Purnell-Jarvis, Ltd.*, 86 Md. App. 390, 399 n.5 (1991).  This contrasts with a "fixed or lump-sum contract" in which "[a] contractor agrees to build the structure for one fixed sum regardless of the actual cost."  *Id.*

(ECF No. 19-1 at p. 1.)  Stated differently, the parties agreed that Barzan would pay Textron for the cost of the work and materials plus fifteen (15) percent of costs, totaling an "estimated Target Cost" of $35,000,000.00.  (ECF No. 1 ¶ 10; ECF No. 15, Countercl. ¶¶ 3, 8–9; ECF No. 19-1 § 4.1.)

Pursuant to Section 3.3 of the Phase 1 Contract, Textron was required to provide certain "deliverables" to Barzan, including, *inter alia*, eight (8) quarterly progress reports ("QPR"), to be provided on a quarterly basis within five business days of a Quarterly Program Status Review ("QPSR").  (ECF No. 19-1 § 3.3.)  A QPR is a "[t]echnical document . . . describing technical accomplishments, schedule performance, and cost incurred."  *Id.* at p. 3.  A QPSR is a "regularly scheduled meeting to review the program's status and any change requirements."  *Id.*  SC Aero alleges that "Textron did not conduct all of the QPSRs and did not provide all of the QPRs."  (ECF No. 15, Countercl. ¶ 13.)

Additional provisions of the Phase 1 Contract include:

> 3.4.1 The TEXTRON PoP[6] is estimated to be twenty-six (26) months from the date of receipt of the $7,000,000.00 down payment.
> . . .
> 4.1 BARZAN has obligated $35,000,000.00 USD to fully fund the estimated Target Cost for the fulfillment of the Statement of Work requirements contained in this Contract. Target Cost includes 15% Fee.
>
> 4.2 BARZAN shall pay a thirty (30) percent down payment of the Target Cost in two payments. The initial down payment of twenty (20) percent in the amount of $7,000,000.00 to TEXTRON is due within thirty (30) days after the Contract Effective Date. Barzan shall pay the remaining down payment of ten (10) percent in the amount of $3,500,000.00 to TEXTRON no later than January 31, 2021.
>
> 4.3 Contract Payments: TEXTRON shall invoice BARZAN monthly for the actual costs incurred the prior month plus the 15%

---

[6] "PoP" means "period of performance" per Article 1 of the Contract.  (ECF No. 19-1 at p. 4.)

fee applied to the actual cost. Down payments received from BARZAN shall [be] decremented by TEXTRON with each monthly invoice submitted in proportion to the down payments received until such time that the total down payment is fully liquidated.

4.4 Continuation of Performance: During each QPSR, BARZAN and TEXTRON shall review the remaining scope and funding to confirm whether they wish to continue performance under the Contract. Confirmation by the Parties to continue performance shall be memorialized by signing the QPR by both Parties. In the event BARZAN decides not to continue performance, the Parties shall follow the steps stated in Article 5.2 Termination for Convenience.

. . .

5.1 THE TERM OF THIS CONTRACT The term of this Contract shall equal the later of: 1) the period of performance which the PARTIES estimate shall be twenty-six (26) months from the date of Textron's receipt of the down payment specified in Article 4.2 of this Contract or Not to Exceed forty-eight (48) months from the effective date of the contract unless extended by the mutual agreement of the PARTIES.

. . .

ARTICLE VI: CONTRACT ADMINISTRATION Unless otherwise provided for in this Contract, approvals, changes, or other agreements are to be made only in writing and signed by both Parties.

. . .

7.1 Negotiation: The Parties will attempt in good faith to resolve through negotiation any dispute, claim or controversy arising out of or relating to this Contract ("Dispute"). Any Party may initiate negotiations by providing written notice in letter form to the Contract Representative of the other Party, setting forth the subject of the Dispute and the relief requested. The recipient of such notice shall respond within ten (10) calendar days with a written statement of their position on, and recommended solution to, the Dispute. If the Dispute is not resolved by this exchange of correspondence, then representatives of each Party with full settlement authority will meet at a mutually agreeable time and place within twenty (20) calendar days of the date of the initial notice in order to exchange relevant information and perspectives, and to attempt to resolve the dispute.[7]

. . .

---

[7] The Phase 1 Contract (and subsequent modifications thereto) also includes a choice of law provision requiring that Maryland law govern any dispute arising out of the Phase 1 Contract. (ECF No. 19-1 § 7.2.) Moreover, "Maryland has recognized the common law doctrine of *lex loci contractus*," meaning that courts applying the law of the jurisdiction where the contract was made—here, Maryland—"when determining the construction, validity, enforceability, or interpretation of a contract . . . ." *Cunningham v. Feinberg*, 441 Md. 310, 326 (2015).

8.1 Limitation of Liability: NOTHWITHSTANDING ANY OTHER PROVISION OF THIS CONTRACT, TEXTRON SHALL NOT BE LIABLE TO BARZAN FOR ANY INCIDENTAL, INDIRECT, PUNITIVE, SPECIAL, REPROCUREMENT, COVER, OR CONSEQUENTIAL DAMAGES OF ANY NATURE WHATSOEVER, ARISING OUT OF OR IN CONNECTION WITH THIS CONTRACT, EVEN IF TEXTRON HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES TEXTRON'S LIABILITY TO BARZAN ARISING OUT OF OR UNDER THIS CONTRACT, WHETHER SUCH LIABILITY ARISES PURSUANT TO ANY CONTRACT, NEGLIGENCE, STRICT LIABILITY, TORT, OR OTHER LEGAL OR EQUITABLE THEORY, SHALL NOT EXCEED $1,000,000 USD. THE PARTIES ACKNOWLEDGE AND AGREE THAT THIS LIMITATION OF LIABILITY REFLECTS AN ALLOCATION OF RISK AND THAT THE TERMS OF THIS CONTRACT WOULD BE SUBSTANTIALLY DIFFERENT IN THE ABSENCE OF SUCH LIMITATION.

. . .

15.1 Amendment. This Contract shall not be amended or modified except in a writing signed by legally authorized representatives of both Parties, with an express statement of intent to amend this Contract.

. . .

15.3 Independent Contractors. The Parties are independent contractors in all relationships and actions contemplated by this Contract, and this Contract shall not be construed to create any employment relationship, partnership, joint venture, or agency relationship, or to authorize any Party to enter into any commitment or agreement binding on the other Party except as expressly stated herein.

(ECF No. 19-1 §§ 3.4.1, 4.1–4.4, 5.1, Art. VI, 7.1, 8.1, 15.1, 15.3.)

### A.  Modifications to the Phase 1 Contract

The parties subsequently executed two modifications of the Phase 1 Contract in January 2021 (ECF No. 19-2; "Phase 1 Contract – Modification 001") and March 2022 (ECF No. 19-3; "Phase 1 Contract – Modification 002").  (ECF No. 1 ¶ 12; ECF No. 15, Countercl. ¶¶ 15–24.)  Both modifications restate the terms of the Phase 1 Contract and include the respective modifications.  (ECF Nos 19-2, 19-3.)  Relevant here, Phase 1 Contract – Modification 001, dated

January 11, 2021, changed the estimated period of performance from twenty-six (26) to thirty-one

(31) months, and set a related payment schedule for the total $35,000,000.00 payment.  (ECF No.

19-2 §§ 3.4.1, 4.3.)

Phase 1 Contract – Modification 002 again increased the estimated period of performance

to thirty-five (35) months.[8]  (ECF No. 19-3 § 3.4.1.)  It also further amended the contract payments

provision, providing:

> 4.3 Contract Payments: The Parties have attached a payment plan as
> Appendix A to the contract TEXTRON shall invoice BARZAN in
> accordance with the payment schedule in Exhibit B and BARZAN
> shall pay such invoice within thirty (30) calendar days of the invoice
> date. TEXTRON shall be entitled to liquidate out of the payments
> any costs incurred by TEXTRON in performance of this Contract
> and TEXTRON'S 15% fee on the costs incurred. TEXTRON shall
> provide a report to BARZAN at the QPSR detailing the amount of
> payments received from BARZAN, the costs and fees liquidated by
> TEXTRON for work performed, and the remaining balance of the
> payments after liquidation. Upon completion of the Contract work,
> TEXTRON shall finalize the payment balances and accounts. For
> any amounts of costs and fee incurred by TEXTRON that is accrued
> in excess the payments received from BARZAN, TEXTRON shall
> submit a final invoice to BARZAN for such amounts and BARZAN
> shall pay such amounts within thirty (30) calendar days. Failure of
> BARZAN to pay TEXTRON for the final invoice amounts in
> accordance with this Article 4.3 waives TEXTRON'S obligations to
> deliver IP and associated licenses under Article 3.8. For any
> amounts not liquidated by TEXTRON, TEXTRON shall reserve and
> apply those amounts to any future agreements between the Parties.

(ECF No. 19-2 § 4.3.)  SC Aero contends the payment increase under the Phase 1 Contract –

Modification 002 constitutes consideration for Textron assisting Barzan with a flight

demonstration at the DIMDEX tradeshow.  (ECF No. 15 at Countercl. ¶ 20.)

---

[8] It also changed the timeline on certain deliverables, but not the QPRs.  (ECF No. 19-2 at § 3.3.)

**B.  November 2022 Funding Commitment**

On November 18, 2022, Textron sent Barzan a "Notice of Potential Stop Work for Phase I [sic] Contract" (ECF No. 19-4), which states in part: "The purpose of this letter is to advise Barzan Aeronautical LLC [] that, due to achieving the contract funding limitations currently authorized on the A5K contract, Textron Systems will stop work on the above-referenced contract effective Wednesday, November 23, 2022, unless Barzan is able to fund or authorize and obligate work above the currently approved contract funding limits."  (ECF No. 19-4.)  SC Aero characterizes Textron's notice as a "threat:"

> Against the backdrop of Textron's delays and failures to provide contractually required information, in November 2022, Textron demanded more money from SC Aero and threatened to walk off the job permanently if SC Aero did not commit millions of additional dollars in funding to Textron within five days.  Having already sunk over $35,000,000 into the project with nothing to show for it more than two years later, SC Aero had no choice but to accede to Textron's ultimatum and sent the November letter indicating that it would pay what Textron demanded.

(ECF No. 15, Countercl. ¶¶ 5, 27.)

Four days later, on November 22, 2022, Barzan responded to Textron's Notice of Potential Stop by letter of its Chief Executive Officer, John Hardwick, to Textron Senior Vice President, Wayne Prender with a *re* line that reads "Barzan-Textron A5000 UAS Program Authorization to Proceed and Commitment to Continue Funding."  (ECF No. 19-5; the "Funding Commitment").  The Funding Commitment provides:

> [Barzan] is in receipt of [Textron's] November 18, 2022, letter (Letter No. UA504578), which follows numerous discussions between Barzan Aero's and Textron's management teams regarding the impending end of Phase 1 work by Textron amidst an accelerated and increased expenditure profile and Textron's resultant need for additional funding, and the Parties' scoping the terms and conditions of Phase 2 prior to executing definitive documents for Phase 2. We are in agreement that the A5000 Program has accomplished much

and built significant momentum to date, and that the work and deliverables expected over the next months should provide significant value to the Program, Barzan Aero, and our mutual stakeholders.

Following discussions with our board leadership in Doha, Barzan Aero provides this letter to confirm the following:

(1) Barzan Aero authorizes Textron to proceed with, obligate, and conclude all work on Phase 1 of the A5000 Project.

(2) Textron should proceed to scope and tender to Barzan Aero its detailed proposal for Phase 2 as soon as practicable. The Parties will meet to clarify any necessary issues and negotiate the final terms of the Phase 2 contract to be awarded to Textron. As soon as practicable thereafter, the Parties execute definitive Phase 2 final agreement.

(3) Barzan Aero agrees to pay Textron the amount of $1,650,000 (One Million Six Hundred Fifty Thousand USD) per month starting in December 2022, for each month through and including July 2023. Initially, such monthly payments will be applied to and be inclusive of Barzan Aero's remaining Phase 1 payments to March 2023 and also the continuation funding requested by Textron. When the Parties have executed the Phase 2 contract, Barzan Aero's monthly payments will be adjusted appropriately to reflect the Phase 2 final agreement's total cost and the agreed structure of monthly payments Barzan Aero will make over the duration of Phase 2. . . .

Barzan Aero authorizes Textron to proceed with and obligate the A5000 work.

Given that time is of the essence and the Parties mutually wish to avoid the undesirable consequences of a stoppage in A5000 Program work, Barzan Aero's leadership has moved expeditiously to provide this authorization to proceed and commitment to fund Phase 1 and qualified general commitment to fund Phase 2. If after reviewing these terms they meet with Textron's satisfaction, please counter-sign this letter where indicated below to reflect Textron's acceptance and return it to me at your earliest convenience.

(ECF No. 19-5.)  Mr. Prender countersigned the Funding Commitment for Textron on the same date it was issued by Mr. Hardwick for Barzan (November 22, 2022).  *Id.*  Thus, through the

Funding Commitment, Barzan agreed to pay Textron $1,650,000.00 per month, beginning December 2022 through July 2023.  *Id.*

Thereafter, Textron resumed its work[9] and invoiced Barzan for $1,650,000 for each of December 2022, January 2023, February 2023, and March 2023.  (ECF No. 1 ¶ 21, 22; ECF No. 15, Ans. ¶ 22; Countercl. ¶ 27.)  Textron's Complaint alleges that Barzan paid only $214,785.71 of the December 2022 invoice and $214,285.71 of the January 2023 invoice.  (ECF No. 1 ¶ 23; ECF No. 15, Ans. ¶ 23; Countercl. ¶ 28.)  Barzan made no payments toward the February and March 2023 invoices.  (ECF No. 1 ¶ 24; ECF No. 15, Ans. ¶ 24; Countercl. ¶ 28.)  By letter dated July 25, 2023, Textron sent Barzan a "Demand for Payment of Overdue Amount," notifying Barzan of its "material breach" of its payment obligation under the Phase 1 Contract – Modification 002, as well as the Funding Commitment.  (ECF No. 1 ¶ 25; ECF No. 15, Countercl. ¶ 5; ECF No. 19-6, "Demand for Payment.")  Despite the Demand for Payment, according to the Complaint, Barzan failed to pay the amounts owed.  (ECF No. 1 ¶ 26.)  SC Aero admits it failed to pay Textron in accordance with its obligations set forth in the Funding Commitment.  (ECF No. 15, Ans. ¶ 23 and Countercl. ¶ 28.)[10]  In turn, SC Aero alleges that Textron has similarly not completed its performance under the Phase 1 Contract.  *Id.* ¶ 29.

---

[9] SC Aero's Counterclaim is silent as to this fact.  (ECF No. 15, Countercl. ¶ 28.)

[10] Textron's Complaint alleges that Barzan "paid only $214,785.71 of the December 2022 invoice and $214,285.71 of the January 2023 invoice."  (ECF No. 1 ¶ 23.)  In response to Tarzan's allegations at paragraph 23 of the Complaint, SC Aero "admits that it made a payment of $214,785.71 on February 7, 2023 and March 2, 2023 and otherwise denies the allegations in Paragraph 23 of the Complaint."  Its Counterclaim, however, alleges it "continued to pay Textron $214,285.71 per month from December 2022 to January 2023 . . . ." (ECF No. 15, Ans.¶ 23; Countercl. ¶ 28.)  This minor discrepancy in the parties' papers is immaterial to the court's adjudication of the Motion.  That notwithstanding, for purposes of the Motion, the court credits the allegations of ¶ 23 Complaint.  *See* note 3, *supra, citing Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009); *and Al-Sabah v. World Bus. Lenders, LLC*, No. CV SAG-18-2958, 2020 WL 3868989, at *8 (D. Md. July 9, 2020).

### C. Procedural History

Textron initiated this action on October 19, 2023, asserting one breach of contract claim against SC Aero for its failure "to pay the full contractual payment for invoices covering December 2022, January 2023, February 2023, and March 2023," totaling $6,171,428.60, pursuant to the Phase 1 Contract – Modification 002 and the Funding Commitment.  (ECF No. 1 ¶¶ 28–30.)  In response, SC Aero answered Textron's Complaint and asserted its Counterclaim.  (ECF No. 15.) SC Aero asserts eight affirmative defenses, including:

> **First Defense**
> 2. Plaintiff's claims are barred, in whole or in part, by its own conduct, including but not limited to, Plaintiff's breach of its contractual obligations and conditions contained in the Phase 1 Contract and any alleged non-performance on the part of SC Aero is therefore excused.
> . . .
> **Third Defense**
> 4. Plaintiff's claims are barred, in whole or in part, by the doctrines of *in pari delicto* and/or unclean hands.
> . . .
> **Fifth Defense**
> 6. Plaintiff's claims are barred in whole or in part because the alleged Authorization to Proceed is not a valid, binding, or enforceable amendment to the Phase 1 Contract or contractual obligation.
>
> **Sixth Defense**
> 7. Plaintiff's claims are barred, in whole or in part, because the purported Authorization to Proceed was obtained under duress and/or unilateral or mutual mistake.

*Id.* at Ans. ¶¶ 2, 4, 6–7.

SC Aero's Counterclaim contends that the Funding Commitment of November 22, 2022, "did not validly modify the Phase 1 Contract," because (1) "it failed to satisfy the requirements for an amendment under the Phase 1 Contract – requirements that the parties adhered to on two prior occasions," (2) "it was the product of duress," and (3) Textron breached the Phase 1 Contract

"when it leveraged its industry expertise and withheld key information from SC Aero." *Id.* at Countercl. ¶ 6.  SC Aero asserts four counts against Textron: breach of contract (First Counterclaim) based on Textron's alleged failure to provide QPRs and failure to hold QSPRs as required; breach of fiduciary duties (Second Counterclaim) arising out of the parties' alleged "relationship of trust and confidence" and Textron's alleged failure to keep SC Aero aware of "potential overruns to the Target Cost and/or Target Timeline"; specific performance (Third Counterclaim) in the alternative (if the court finds the Funding Commitment enforceable against SC Aero); and unjust enrichment (Fourth Counterclaim) because "SC Aero has paid Textron over $37,000,000 and received nothing in return" and Textron has unjustly enjoyed the benefits of the UAS research and development funded by SC Aero.  *Id.* at p. 14–18.

The court now turns to the Motion.  (ECF No. 19.)

## II.  <u>LEGAL STANDARD</u>

In its Motion, Textron seeks Rule 12(c) judgment on the Complaint and Rule 12(b)(6) dismissal of SC Aero's Counterclaim; alternatively, Textron seeks summary judgment as to the Complaint and Counterclaim in their entirety.  (ECF No. 19 at p. 2.)  "A motion with this caption implicates the court's discretion under Fed. R. Civ. P. 12(d)." *Snyder v. Md. Dep't of Transp.*, No. CCB-21-930, 2022 WL 980395, at *4 (D. Md. Mar. 31, 2022).  Federal Rule of Civil Procedure 12(d) provides: "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." FED. R. CIV. P. 12(d).  "Pursuant to Rule 12(d), the Court has discretion to determine whether to accept evidence outside the pleadings, and thus convert a Rule 12(b)(6) [or Rule 12(c)] motion to a Rule 56 motion." *Coleman v. Calvert Cnty.*, No. GJH-15-920, 2016 WL 5335477, at *3 (D. Md. Sept. 22, 2016) (citations omitted).

"There are two requirements for a proper Rule 12(d) conversion." *Greater Balt. Ctr. for Pregnancy Concerns. Inc. v. Mayor and City Council of Balt.*, 721 F.3d 264, 281 (4th Cir. 2013). "First, all parties must 'be given some indication by the court that it is treating the [Rule 12(b)(6) or 12(c)] motion as a motion for summary judgment,' which can be satisfied when a party is aware 'material outside the pleadings is before the court.'" *Snyder v. Maryland Dep't of Transportation*, No. CV CCB-21-930, 2022 WL 980395, at *4 (D. Md. Mar. 31, 2022) (quoting *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985)).   Second, customarily, the parties must first "be afforded a reasonable opportunity for discovery." *Gay*, 761 F.2d at 177.

As more fully below discussed below, the court need not consider matters outside the pleadings to rule on the Motion, and, as of the filing of the Motion, the parties had not engaged in discovery.  In view of the foregoing,  the court declines to convert the Motion to a Rule 56 motion.

### A. Federal Rule of Civil Procedure 12(b)(6): Motion to Dismiss

A motion asserted under Rule 12(b)(6) "test[s] the sufficiency of a complaint;" it does not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)).  Therefore, a "Rule 12(b)(6) motion should only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Edwards*, 178 F.3d at 244.

"While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption

that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations and footnote omitted). "[A] complaint that provides no more than 'labels and conclusions,' or 'a formulaic recitation of the elements of a cause of action,' is insufficient." *Bourgeois v. Live Nation Ent., Inc.*, 3 F. Supp. 3d 423, 434 (D. Md. 2014) (quoting *Twombly*, 550 U.S. at 555). "The [c]ourt must be able to deduce 'more than the mere possibility of misconduct'; the facts of the complaint, accepted as true, must demonstrate that the plaintiff is entitled to relief." *Evans v. 7520 Surratts Rd. Operations, LLC*, No. 8:21-CV-01637-PX, 2021 WL 5326463, at *2 (D. Md. Nov. 16, 2021) (quoting *Ruffin v. Lockheed Martin Corp.*, 126 F. Supp. 3d 521, 526 (D. Md. 2015)).

## B.  Federal Rule of Civil Procedure 12(c): Motion for Judgment on the Pleadings

A party may move for judgment on the pleadings after the pleadings are closed, so long as the motion is made early enough not to delay trial. FED. R. CIV. P. 12(c). "A motion for judgment on the pleadings under Rule 12(c) is assessed under the same standard applicable to motions to dismiss under Rule 12(b)(6)." *Green v. Sw. Credit Sys., L.P.*, 220 F. Supp. 3d 623, 624 (D. Md. 2016) (citing *Walker v. Kelly*, 589 F.3d 127, 139 (4th Cir. 2009)). A Rule 12(c) motion, like a Rule 12(b)(6) motion, does not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)). Accordingly, in considering a Rule 12(c) motion, the court also "assume[s] all well-pled facts to be true and draw[s] all reasonable inferences in favor of" the non-moving party. *Belmora LLC v. Bayer Consumer Care AG*, 819 F.3d 697, 702 (4th Cir. 2016). "A motion for judgment on the pleadings pursuant to Rule 12(c), . . . should not be granted unless it appears to a certainty that the non-moving party cannot prove any set of facts in support of its claim that would entitle it to

13

relief." *United States v. Castillo*, No. 8:19-CV-3459-PWG, 2021 WL 825974, at *3 (D. Md. Mar. 4, 2021) (citing *Shooting Point, L.L.C. v. Cumming*, 238 F. Supp. 2d 729, 735 (E.D. Va. 2002), *aff'd*, 368 F.3d 379 (4th Cir. 2004)).

### 1. *Timeliness*

As a preliminary matter, SC Aero contends the Rule 12(c) aspect of the Motion is premature, because it was filed before the Counterclaim was answered, which is to say, the pleadings are not "closed" as required by Rule 12(c). (ECF No. 22 at p. 12–13.) Pursuant to Rule 7(a), "the pleadings are closed upon the filing of a complaint and an answer (absent a court-ordered reply), unless a counterclaim, crossclaim, or third-party claim is interposed, in which event the filing of an answer to a counterclaim, crossclaim answer, or third-party answer normally will mark the close of the pleadings." 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1367 (3d ed.). "Although [a Rule 12(c)] motion is typically available only when all pleadings have been served and filed, if all the pleadings for the claims or defenses to which the motion is addressed have closed, the fact that some pleadings remain for later filing does not preclude a motion for judgment on the pleadings." 2 James Wm. Moore et al., *Moore's Federal Practice* § 12.38 (3d ed.).

Courts have reached different conclusions in deciding whether to rule on a motion for judgment on the pleadings before an answer to a counterclaim has been filed. *See, e.g.*, *NanoMech, Inc. v. Suresh*, 777 F.3d 1020, 1023 (8th Cir. 2015) ("Although NanoMech is technically correct that Rule 12(c) requires all pleadings to be closed before a motion may be filed, NanoMech did not suffer any prejudice as a result of the district court's decision. Suresh moved to dismiss only NanoMech's claims, which were closed when Suresh filed her motion."); *EMD Performance Materials Corp. v. Marque of Brands Americas LLC*, 578 F. Supp. 3d 670, 679 (E.D. Pa. 2022)

(adopting the rationale of *Moore's Federal Practice* and concluding that the Rule 12(c) motion was ripe); *Niederland v. Chase*, No. 11 CIV. 6538, 2012 WL 2402603, at *4–5 (S.D.N.Y. June 26, 2012) (denying a Rule 12(c) motion as premature where a party had "not yet served a reply to the Counterclaims" that were the subject of a motion to dismiss).

Here, the court is persuaded that it is fair (*i.e.,* non-prejudicial to SC Aero) and appropriate to consider the 12(c) Motion because the pleadings have closed as to Textron's claim—the only claim for which it seeks Rule 12(c) judgment.

## C. Consideration of Exhibits

Both parties attach exhibits to be considered in ruling on the Motion.  Textron attaches documents to the Motion that it contends are "[c]ontractual documents and other undisputed documents identified in the pleadings," which the court may consider as integral to the Complaint, including:  the Phase 1 Contract (ECF No. 19-1); Phase 1 Contract – Modification 001 (ECF No. 19-2); Phase 1 Contract – Modification 002 (ECF No. 19-3); Textron's Notice of Potential Stop Work for Phase 1 Contract (ECF No. 19-4); the Funding Commitment (ECF No. 19-5); and Textron's Demand Letter for Payment of Overdue Amount (ECF No. 19-6.)  To its opposition, SC Aero attaches the Outline of Textron and Barzan's Commercial UAS Project (ECF No. 22-1); the MRA (ECF No. 22-2); and a service/restoration contract from a different case (ECF No. 22-3.)

In ruling on a motion to dismiss pursuant to Rule 12(b)(6) or a motion for judgment on the pleadings pursuant to Rule 12(c), the court generally does not consider evidence outside of a complaint (and, relevant here, a counterclaim).  The court may, however, consider "documents integral to and relied upon in the complaint, . . . so long as the plaintiff does not question their authenticity." *Fairfax v. CBS Corp.*, 2 F.4th 286, 292 (4th Cir. 2021).  "An integral document is a document that by its 'very existence, and not the mere information it contains, gives rise to the

legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d. 602, 611 (D. Md. 2011) (quoting *Walker v. S.W.I.F.T. SCRL*, 517 F. Supp. 2d 801, 806 (E.D. Va. 2007)).  Notably, "courts have found integral . . . the documents that constitute the core of the parties' contractual relationship in a breach of contract dispute." *St. Michael's Media, Inc. v. Mayor & City Council of Baltimore*, No. CV ELH-21-2337, 2023 WL 2743361, at *9 (D. Md. Mar. 31, 2023) (quoting *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 n.4 (D. Md. 2011)).  "In addition to integral and authentic exhibits, on a 12(b)(6) motion the court 'may properly take judicial notice of matters of public record.'"  *Id.* (quoting *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)).

Against this backdrop, and because neither party disputes the authenticity of any exhibit, the court may consider the exhibits offered by the parties in ruling on the Motion, as they are either documents at the core of the parties' contractual relationship (and thus give rise to the legal rights asserted) or are a matter of public record of which this court may take judicial notice.

## III.  <u>ANALYSIS</u>

### A.  **Motion for Judgment on the Pleadings**

In support of its Rule 12(c) argument, Textron first asserts that it is entitled to judgment as to liability on its breach of contract claim, because there is no dispute that the Funding Commitment is a valid and enforceable contract, or that SC Aero has not paid the amount due. (ECF No. 19 at p. 13.)  It then contends that each of SC Aero's affirmative defenses fails as a matter of law.  The court turns first to Textron's argument as to SC Aero's defense/allegation of duress (as to enforceability of the November 2022 Funding Commitment)[11] because conclusion that the affirmative defense is properly interposed (and not barred as a matter of law, as Textron

---

[11] ECF No. 15, Sixth Affirmative Defense, Ans. ¶ 6 at 6; Countcl. ¶ 6.

urges) would foreclose 12(c) judgment for Textron.  (*See* ECF No. 15, Sixth Affirmative Defense, at 6 ¶6.)

### 1.  SC Aeron's Sixth Affirmative Defense and Counterclaim Allegation of Duress

In Maryland, duress is "a wrongful act which deprives an individual of the exercise of his free will."  *Eckstein v. Eckstein*, 38 Md. App. 506, 512 (1978).  Generally, duress is found in instances where "(1) one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that the circumstances were the result of the coercive acts of the opposite party."  *Id.* at 514; *see Miller v. Miller*, No. 1834, Sept. Term, 2021, 2022 WL 16707234, at *8 (Md. Ct. Spec. App. Nov. 3, 2022) (same).  The Appellate Court of Maryland, citing to an opinion from the Supreme Court of Maryland, has explained:

> "The element of obligation upon which a contract may be enforced springs primarily from the unrestrained mutual assent of the contracting parties, and where the assent of one to a contract is constrained and involuntary, he will not be held obligated or bound by it.  A contract, the execution of which is induced by fraud, is void, and a stronger character cannot reasonably be assigned to one, the execution of which is obtained by duress.  Artifice and force differ only as modes of obtaining the assent of a contracting party, and a contract to which one assents through imposition or overpowering intimidation, will be declared void, on an appeal to either a court of law or equity to enforce it.  The question, whether one executes a contract or deed with a mind and will sufficiently free to make the act binding, is often difficult to determine, but for that purpose a court of equity, unrestrained by the more technical rules which govern courts of law in that respect, will consider all the circumstances from which rational inferences may be drawn, and will refuse its aid against one who, although apparently acting voluntarily, yet, in fact, appears to have executed a contract, with a mind so subdued by harshness, cruelty, extreme distress, or apprehensions short of legal duress, as to overpower and control the will."

*Lloyd v. Niceta*, 255 Md. App. 663, 695 n.10 (2022), *cert. granted,* 482 Md. 733 (2023), and *aff'd,* 485 Md. 422 (2023) (quoting *Eckstein*, 38 Md. App. at 512–13).

Under Maryland law, duress is composed of two elements: "(1) A wrongful act or threat by the opposite party to the transaction or by a third party of which the opposite party is aware and takes advantage, and (2) a state of mind in which the complaining party was overwhelmed by fear and precluded from using free will or judgment." *Food Fair Stores, Inc. v. Joy*, 283 Md. 205, 217 (1978) (citing *Plechner v. Widener College, Inc.*, 418 F. Supp. 1282, 1294 (E.D. Pa. 1976)); *see Reisinger v. Sams*, No. 521, Sept. term, 2023, 2024 WL 1152552, at *18 (Md. Ct. Spec. App. Mar. 18, 2024) (same). "To be wrongful, . . . acts which are in themselves lawful must be so oppressively used as to constitute an abuse of legal remedies." *Meredith v. Talbot Cnty.*, 80 Md. App. 174, 183–84 (1989) (citing *Food Fair Stores, Inc. v. Joy*, 283 Md. 205, 217 (1978)). "Necessarily, the determination of duress is dependent upon the circumstances of each individual case." *U.S. for Use of Trane Co. v. Bond*, 322 Md. 170, 182 (1991). "[A] contract procured through undue influence or that results from duress is not automatically void; instead, it is merely voidable," and thus "may also be ratified." *Young v. Anne Arundel Cnty.*, 146 Md. App. 526, 597 (2002).

Specifically on the topic of economic duress, as SC Aero claims here, the Appellate Court of Maryland has explained:

> A party claiming economic duress must prove: "(1) [a] wrongful act or threat" by the other party to the transaction, and (2) that "the complaining party was *overwhelmed by fear and precluded from using free will or judgment*." *Meredith v. Talbot County*, 80 Md. App. 174, 183, 560 A.2d 599 (1989) (cleaned up) (emphasis added). Mr. Tufaro conceded at the evidentiary hearing that he was not threatened physically and, if anything, that he was the party "noisily upset" during negotiations. He also testified that he "made a business decision" when agreeing to the Second Amendment, that he had an opportunity to consult with other lawyers once he had notice of the delinquency proceedings (the day after the Rehabilitation Order was entered), and that he accepted the Second

18

> Amendment so that he "could get something as opposed to nothing."
> "Mere stress of business" is not duress when RRC "was not
> responsible for such circumstances." *Shillman v. Hobstetter*, 249
> Md. 678, 693, 241 A.2d 570 (1968).

*Baltimore Cotton Duck, LLC v. Ins. Comm'r of the State of Maryland*, 259 Md. App. 376, 400–

401 (2023), *cert. denied sub nom.* 486 Md. 396 (2024) (emphasis in original).

Textron argues that SC Aero's assertion of duress (as an affirmative defense and

Counterclaim charge) fails as a matter of law because nothing in the record shows that "the

Funding Commitment arose out of anything other than ordinary commercial pressure . . . ."[12]  (ECF

No. 19 at p. 18.)  In support of its argument, Textron cites an opinion of this court, which – relying

solely on a 1983 Eastern District of Pennsylvania case – stands for the proposition that "[f]inancial

pressure or unequal bargaining power is insufficient to establish economic duress."  (ECF No. 19

at p. 17–18 (quoting *MedSense, LLC v. Univ. Sys. of Maryland*, No. PWG-20-892, 2021 WL

3142004, at *11 (D. Md. July 26, 2021) (citing *Reed v. SmithKline Beckman Corp.*, 569 F. Supp.

672, 675 (E.D. Pa. 1983))).

In *MedSense,* the court concluded on a motion (to dismiss converted as one) for summary

judgment that, in the face if an express contract provision that "[e]ach Party has read and fully

understands this [release] Agreement and has signed the Agreement without any duress," the

defendant's affidavit that the subject release was voidable because it was signed under financial

duress failed to defeat the motion.  Specifically, the defendant asserted that if it had not acquiesced

---

[12] Textron also avers that the statements in the Funding Commitment, including that the program "has accomplished much and built significant momentum," "are not the words of a coerced party being subjected to wrongful acts." (ECF No. 19 at p. 18.)  Textron's point is well-taken; however, at this stage of litigation, the court is not in the position of evaluating the credibility of SC Aero's claim that the Funding Commitment was the product of financial duress caused by the Notice of Potential Stop.  Rather, the court is tasked with determining whether, based on SC Aero's admissions and Counterclaims allegations (with reasonable inferences tipping in SC Aero's favor), the defense/claim is legally sound.  *See* note 3, *supra.*  The court appreciates that SC Aero's duress shield may not offer the cover it seeks as the case progresses, but that moment is not now.

to the release, it would not have had access to contract deliverables that would allow it to reap the financial benefits of licensing related intellectual property.  Importantly, the court found that the undisputed facts established that the defendant had a contractual right to certain of the deliverables it ostensibly required through an affiliated contract – a right the defendant never exercised.

Given the express non-duress provision of the release, the defendant's undisputed alternative means of access to (some of the) deliverables the defendant claimed (only by responsive affidavit) created the financial duress circumstances, and the summary judgment posture of the case, this court finds the instant case materially distinguishable from *MedSense*.  Moreover – critically – there, Judge Grimm did not have the benefit of the thoughtful expositions on commercial duress provided by *Lloyd* and *Baltimore Cotton Duck, supra* – neither of which had yet been issued.  *Lloyd v. Niceta* 255 Md. App. 663 (2022), *cert. granted,* 482 Md. 733 (2023), and *aff'd,* 485 Md. 422 (2023); *Baltimore Cotton Duck, LLC v. Ins. Comm'r of the State of Maryland*, 259 Md. App. 376 (2023), *cert. denied sub nom.* 486 Md. 396 (2024).

All that being said, while Textron's argument brings scrutiny, if not doubt, upon SC Aero's ability successfully to demonstrate economic duress, the court declines to conclude that the defense fails as a matter of law at this early stage and particularly given the court's obligation to draw all reasonable inferences in SC Aero's favor.  SC Aero alleges a situation in which it expended many millions of dollars on Textron's services – services unique to Textron's expertise – and, according to its telling, had "nothing to show for it" (ECF No. 15, Countcl. ¶ 1); it feared it would be at a loss of over $37,000,000 if it did not comply with Textron's demand.  The court finds such allegations (accepted as true) sufficient at this stage of litigation to support a claim of duress.  For these reasons, Textron's Motion for 12(c) judgment on its breach of contract claim is denied.[13]

---

[13] Except as set forth in this note, the court does not address Textron's arguments as to the remaining affirmative defenses because, apart from the 12(c) and 12(b)(6) relief otherwise addressed in this memorandum, Textron does not

## B.  Motion to Dismiss

Textron also seeks dismissal of all of SC Aero's counterclaims.  (ECF No. 19 at pp. 19–29.)  The court addresses each counterclaim in turn.

### 1.  *Breach of Contract (Counterclaim I)*

Textron contends that SC Aero's Counterclaim for breach of contract fails on its face, because it "ignores the Funding Commitment" which Textron of course maintains "still exists and is enforceable." *Id.*at 20  Specifically, Textron urges that its alleged failures and delays on which Counterclaim I rests predate the Funding Commitment and, therefore, SC Aero's breach of contract claim "cannot  coexist with the Funding Commitment," because Barzan effectively waived it by carrying on and accepting the benefit of Textron's work (following the Funding Commitment). *Id.*  But SC Aero expressly denies the enforceability of the Funding Commitment (ECF No. 15, Ans. ¶¶ 18-20); and against the backdrop of the court's above analysis regarding SC Aero's Counterclaim allegation of duress and duress affirmative defense to the Complaint, at this juncture, Textron's argument is unavailing.  The Counterclaim for breach of contract survives the 12(b)(6) crucible.  The court fully expects Textron to revisit this issue on a Rule 56 motion.

Textron also argues that dismissal of Counterclaim I is proper because SC Aero fails to allege "that it provided timely notice or engaged in the good-faith dispute resolution process for

---

seek specific relief, *e.g.*, a Rule 12(f) motion to strike.  Rather, Textron alleges generally that SC Aero's affirmative defenses are "infirm" or "fail."  (*See, e.g.,* ECF No. 19 at p. 18, 19 n.11.)  The court does note, however, that Textron urges that SC Aero's mistake affirmative defense (which SC Aero partners with duress at the Sixth Affirmative Defense) be disallowed because "Maryland law 'is clear that absent intentional, culpable conduct, such as . . . duress . . . a unilateral mistake is ordinarily not a ground for relief from a contract.'"  (ECF No. 19 at 18-19, quoting *Nationwide Mut. Ins. Co. v. Voland*, 103 Md. App. 225, 235 (1995).)  Because the court finds the duress affirmative defense may stand at this point in time, there is a legal basis – albeit slim – for the mistake affirmative defense.  But, as Textron notes (ECF No. 19 at p. 19) SC Aero's mistake defense is too anemic to pass muster even at this permissive stage.  As Textron points out, a defense of mistake is subject to Rule 9(b)'s heightened pleading standard.  *Bakery & Confectionary Union & Indus. Int'l Pension Fund v. Just Born II, Inc.*, 888 F.3d 696, 704 (4th Cir. 2018).  SC Aero's Counterclaim offers no factual basis whatsoever to support the defense.  The court, therefore, will *sua sponte* strike it for failure to "state with particularity the circumstances constituting . . . mistake."  FED. R. CIV. P. 9(b); *see* FED. R. CIV. P. 12(f), allowing the court to "act on its own" to "strike from a pleading an insufficient defense."

21

this claim in accordance with Article VII of the [Phase 1 Contract]." (ECF No. 19 at p. 21.) SC Aero does allege, however, that it "attempted to resolve these issues amicably [] to no avail." While SC Aero's pleading surely could be more robust on this issue, the court is obliged to accept this allegation as true and to draw reasonable inferences in SC Aero's favor. (ECF No. 15, Countercl. ¶ 29.)

The Motion will be denied as to Counterclaim I.

### 2. *Breach of Fiduciary Duties (Second Counterclaim)*

Textron next argues that SC Aero does not state a claim for breach of fiduciary duties because it has not alleged a fiduciary relationship. (ECF No. 19 at p. 26–27.) SC Aero avers that it has adequately pled the existence of a fiduciary duty that arose from the contractual relationship between the parties based on SC Aero "bestow[ing] full trust and confidence in Textron to develop the [UAS]." (ECF No. 22 at p. 18–19.)

"[A] fiduciary duty is, in general, a duty to act for the benefit of another on matters within the scope of the parties' relationship." *Plank v. Cherneski*, 469 Md. 548, 601 (2020) (citing Restatement (Third) of Torts: Liab. For Econ. Harm § 16 cmt. a (Am. Law Inst. 2020)). "To establish a breach of fiduciary duty as an independent cause of action, a plaintiff must show: '(i) the existence of a fiduciary relationship; (ii) breach of the duty owed by the fiduciary to the beneficiary; and (iii) harm to the beneficiary.'" *Plank*, 469 Md. at 599 (citing *Froelich v. Erickson*, 96 F. Supp. 2d 507, 526 (D. Md. 2000)). "[F]iduciary relationships can be created by common law, by statute, or by contract, and can have different characteristics." *Id.* at 598. *See Gandy v. Howard Cnty. Bd. of Educ.*, No. CV GLR-20-3436, 2021 WL 3911892, at *5 n.4 (D. Md. Sept. 1, 2021) (same) (quoting *Froelich*, 96 F. Supp. 2d at 526). A court considers the "nature of the fiduciary relationship" on a case-by-case basis. *Plank*, 469 Md. at 599. "Well-known examples

of habitual or categorical fiduciary relationships include those between trustees and beneficiaries, agents and principals, directors and corporations, lawyers and clients, and guardians and wards, as well as the relationship among partners." *Id.* at 598 (citations omitted).

"[A] fiduciary relationship will have 'general responsibilities that are common to all settings[,]'" and "specific obligations that vary from one circumstance to the next." *Id.* at 601. "Normally, the determination of whether a fiduciary relationship exists between two individuals is a question of fact." *McElwee v. Williams*, No. 1194, Sept. term, 2019, 2020 WL 6748799, at *3 (Md. Ct. Spec. App. Nov. 17, 2020) (citing *Brass Metal Products, Inc. v. E-J Enters., Inc.*, 189 Md. App. 310, 355 (2009)). "When the facts do not support a finding" of a fiduciary relationship, however, a court "may properly decide the issue as a matter of law." *Brass Metal Prod.*, 189 Md. App. at 358 (citing *Williams v. Dresser Indus., Inc.*, 120 F.3d 1163, 1168 (11th Cir. 1997)).

On the topic of fiduciary (or confidential) relationships between business entities, the Appellate Court of Maryland explains:

> Neither party cited any Maryland caselaw addressing when a confidential relationship arises between two business entities. Other courts, however, have stated that, "[g]enerally, business relationships are not confidential relationships." *Williams v. Dresser Indus., Inc.,* 120 F.3d 1163, 1168 (11th Cir. 1997). Where businesses are engaged in an "arm's length" transaction, a confidential relationship does not exist. *See GMC v. Bell,* 714 So.2d 268, 280 (Ala. 1996) (no confidential relationship between General Motors dealership and its General Motors Acceptance Corporation because "[t]here is no question that the dealership and GMAC were, at all times, dealing with each other at arm's length."); *Bourgois v. Montana–Dakota Utils. Co.,* 466 N.W.2d 813, 819 (N.D. 1991) ("A fiduciary or confidential or other special relationship does not ordinarily exist when business persons deal with each other at arm's length.").
>
> To be sure, a confidential relationship may exist in a business relationship. Certain factors above and beyond a typical business relationship must exist, however. *See Exxon Corp. v. Breezevale, Ltd.,* 82 S.W.3d 429, 443 (Tex. App. 2002) ("The fact that one

businessman trusts another and relies on another to perform a contract does not give rise to a confidential relationship, because something apart from the transaction between the parties is required."). *See also MacBride v. Pishvaian,* 402 Md. 572, 583, 937 A.2d 233 (2007) (where lessor-lessee relationship was an "arm's-length contractual relationship," no confidential relationship existed absent "specific facts" "that would support a determination that the parties had a relationship built on trust and confidence such that appellant had a right to rely on appellee's good faith.").

*Brass Metal Products, Inc. v. E-J Enterprises, Inc.*, 189 Md. App. 310, 356–57 (2009).[14]

Textron argues that the parties here, plainly two sophisticated commercial entities,[15] entered "an arm's length contract," so no fiduciary relationship existed between them – and, hence, no fiduciary duty was owed by Textron to Barzan.  (ECF No. 19 at p. 26–27.)  At paragraph 3 of the Counterclaim, SC Aero alleges: "Relying on Textron's purported expertise in the UAS market, SC Aero agreed to fund the project on a cost plus a 15% fee basis."  (ECF No. 15, Countercl. ¶ 3.)

---

[14] *See Thompson v. UBS Fin. Servs., Inc.*, 443 Md. 47, 70 (2015) (noting that, at least in the constructive fraud context, "all fiduciary relationships are confidential relationships").

[15] SC Aero, a commercial aeronautical entity, variously alleges and admits it entered a contract to pay (at least) $350,000,00 for (1) the development a UAS prototype, (2) establishment of a facility to produce it commercially, (3) licenses of related intellectual property, and (4) UAS training centers for SC Aero to use.  Importantly, with respect to Barzan's entitlement to intellectual property, the Phase-1 Contract provides:

3.8.3 Except as set forth herein, upon delivery of the above IP Barzan shall receive a limited exclusive worldwide perpetual, non-transferable, (except as provided in Section 15.4 herein), royalty-free, paid-up, sub-licensable license to use, make, have made, sell, assemble, offer for sale, create copies of, and make derivative works of the Production Representative AV, minus the Critical Components, solely at BARZAN's continental United States facilities.

3.8.4 In addition, upon delivery of the above IP, Barzan shall receive a worldwide (except as set forth herein), perpetual, non-transferable, (except as provided in Section 15.4 herein), royalty-free, paid-up, sublicensable license to use, Sell, offer for sale, the Production Representative UAS PRODUCT including the Software embedded in any of the deliverables[.]

3.8.5 BARZAN shall also have a license to use any TEXTRON patents and TEXTRON patent applications necessary for BARZAN to exercise its other license rights regarding the Production Representative UAS PRODUCT.

3.8.6 BARZAN shall also receive the current construction drawings of TEXTRON's Blackstone Virginia Assembly Facility, to allow BARZAN to produce their own assembly facility in South Carolina.

The court is on solid footing in concluding that Barzan was a highly sophisticated contracting party; and it asserts nothing to the contrary.

24

On that basis alone (there being no other allegation pertinent to the alleged fiduciary relationship of the parties), SC Aero rests its scant Counterclaim for breach of fiduciary duties:

> 47. SC Aero repeats and realleges each of the allegations contained in Paragraphs 1 through 46 of this Counterclaim.
>
> 48. Textron owed fiduciary duties to SC Aero because a relationship of trust and confidence existed between the Parties. Such relationship existed given that the collaboration entailed a unique and highly technical project whereby Textron agreed to use its expertise to develop a A5000 UAS subject to SC Aero's specific requirements.
>
> 49. SC Aero justifiably relied on Textron's good faith and had an expectation of fair dealing. Textron was experienced in the UAS development and manufacturing markets and SC Aero justifiably relied on that experience.
>
> 50. Upon information and belief, Textron breached the duty owed to SC Aero to keep SC Aero fully and immediately aware of any potential overruns to the Target Cost and/or Target Timeline.

(ECF No. 15, Countercl. ¶¶ 47-50 at 16.)

While fiduciary duties surely can arise under a contract, *see Brass Metal Products, supra,* there is nothing "above and beyond" the norm here. That Barzan relied on Textron's expertise to do a job (even a highly technical job) is the reason why contracts exist – to pay another with relevant skill or expertise to do something one cannot, or prefers not, to do oneself.[16] The counterclaim for breach of fiduciary duties does little, if anything, more than rely on a single pat, conclusory allegation of reliance on Textron's expertise on which to erect its claim. Even construed generously in favor of SC Aero, nothing in the pleadings and exhibits before the court reasonably gives rise to a conclusion that the parties' relationship was of a fiduciary nature.

Textron's Motion to dismiss Counterclaim II for breach of fiduciary duties is granted.

---

[16] SC Aero's allegation that Textron breached its duty of good faith and fair dealing (ECF No. 15, Countercl. ¶ 49 at 16) does not advance the ball, inasmuch as every contract is imbued with that duty under Maryland law.

### 3.  *Specific Performance (Third Counterclaim)*

Textron further seeks dismissal of SC Aero's specific performance claim for failure to allege sufficient facts and because the agreement here is akin to a personal services contract for which specific performance is not an available remedy.  (ECF No. 19 at p. 27–28.)  SC Aero contends that this statement of law is incorrect, and, regardless, SC Aero's Counterclaim sets forth adequate allegations to establish that monetary damages are inadequate to make it whole.  (ECF No. 22 at p. 22–23.)

"Specific performance is an 'extraordinary' contract remedy that is only available to enforce a valid contract against one party." *Falls Garden Condo. Ass'n, Inc. v. Falls Homeowners Ass'n, Inc.*, 441 Md. 290, 309 n.8 (2015).  Specific performance is available where "more traditional remedies, such as damages, are either unavailable or inadequate." *Archway Motors, Inc. v. Herman,* 37 Md. App. 674, 681 (1977).  "The required elements for specific performance are as follows: '(1) a valid contract exists; (2) the party is ready, willing, and able to perform; and (3) the balance of the equities tips in favor of the party seeking performance.'" *Fam. of Care Real Est. Holding Co. v. Chapman Prop., LLC*, No. CV DKC 23-574, 2024 WL 3161540, at *9 (D. Md. June 25, 2024) (quoting *Bresler v. Wilmington Tr. Co.*, No. 09-cv-2957-PJM, 2015 WL 1402377, at *25 (D. Md. Mar. 25, 2015), *amended in part*, No. 09-cv-2957-PJM, 2015 WL 4385994 (D. Md. July 10, 2015)).

Dismissal of a specific performance claim is appropriate where a plaintiff "has not pleaded any facts supporting [its] position that specific performance—as opposed to monetary damages—is the necessary remedy." *Heravi v. Gaming Network Solutions*, *LLC*, No. PWG-15-1178, 2016 WL 3753156, at *6 (D. Md. July 13, 2016); *see Wal-Mart Real Est. Bus. Tr. v. Garrison Realty Invs., LLC*, No. CV RDB-21-02319, 2022 WL 3647781, at *10 (D. Md. Aug. 24, 2022) (same).

Here, SC Aero alternatively asserts a claim for specific performance, alleging:

> Textron undertook in the November 22 letter to complete its
> obligations under the Phase 1 Contract by March 31, 2023.  It has
> failed to do so.  Instead, after receiving over $37,000,000 and
> benefiting from the development of valuable IP and acquisition of
> sensitive UAS components, Textron has ceased all work on the
> Phase 1 project and insists that SC Aero make payments under the
> November 22 letter without any commitment to complete Textron's
> own obligations.

(ECF No. 15, Countercl. ¶ 23.)  SC Aero's allegations also detail the more than $37,000,000 it has

expended on this "highly unique and technical project" that was developed with Textron's

specialized expertise in this area.  *Id.* ¶¶ 1, 48.   While SC Aero makes a clear point that it paid

Textron a lot of money and "has nothing to show for it," nothing in the Counterclaim comes close

to alleging facts from which it might reasonably be concluded that money would not make it whole.

SC Aero describes what it views as a commercially and financially unfair result that has caused it

cognizable injury, but SC Aero makes no effort to explain why being made financially whole

would be inadequate or inequitable.  (For example, it alleges no lost lead time in a relevant market

or anything else of the sort.)  Drawing all reasonable inferences in SC Aero's favor, and generously

so, these factual allegations are inadequate to allege that monetary damages are insufficient to

render it whole.

The Motion as to the Third Counterclaim is granted.

### 4.  *Unjust Enrichment Claim (Fourth Counterclaim)*

Finally, Textron seeks dismissal of SC Aero's unjust enrichment claim based on the

existence of an expressed contract.  (ECF No. 19 at p. 29.)  "[U]njust enrichment and quantum

meruit, both 'quasi-contract' causes of action, are remedies to provide relief for a plaintiff when

an enforceable contract does not exist but fairness dictates that the plaintiff receive compensation

for services provided."  *Cnty. Comm'rs of Caroline Cnty. v. J. Roland Dashiell & Sons, Inc.*, 358

Md. 83, 96–97 (2000) (quoting *Dunnaville v. McCormick & Co.*, 21 F.Supp.2d 527, 535 (1998));
*see AXE Properties & Mgmt., LLC v. Merriman*, 261 Md. App. 1, 33 (2024) (same).   A quasi-
contract claim relates to "an obligation which the law creates in absence of any agreement, when
and because the acts of the parties or others have placed in the possession of one person money,
or its equivalent, under such circumstances that in equity and good conscience he ought not to
retain it." *Chassels v. Krepps*, 235 Md. App. 1, 17–18 (2017) (quoting *J. Roland Dashiell & Sons,
Inc.*, 358 Md. at 94–95 (2000)).

"It is settled law in Maryland . . . that a claim for unjust enrichment may not be brought
where the subject matter of the claim is covered by an express contract between the parties." *J.
Roland Dashiell & Sons, Inc.*, 358 Md. at 96 (*FLF, Inc. v. World Publications, Inc.,* 999 F. Supp.
640, 642 (D. Md. 1998).  Of course, however, a plaintiff "is not barred from pleading these theories
in the alternative where the existence of a contract concerning the subject matter is in dispute."
*J.E. Dunn Const. Co. v. S.R.P. Dev. Ltd. P'ship*, 115 F. Supp. 3d 593, 608 (D. Md. 2015) (citation
omitted).   Indeed, "at least at the pleadings stage, Plaintiffs may plead a claim for unjust
enrichment in the alternative, in the event that the alleged contracts are unenforceable." *Franzoy
v. Yockey*, 695 F. Supp. 3d 696, 700 (D. Md. 2023); *see* FED. R. CIV. P. 8(d)(2) ("A party may set
out [two] or more statements of a claim [] alternatively . . . .").

SC Aero is permitted to assert a quasi-contract claim under Maryland law, where, as here,
there is a purported contract in dispute; however, its Counterclaim for unjust enrichment will be
construed as an alternative claim.  Textron's Motion is denied as to the Counterclaim for unjust
enrichment.

**IV.** <u>**CONCLUSION**</u>

For the reasons set forth herein, by separate order, the Motion will be granted in part and denied in part.


September 10, 2024

/S/
_____
Julie R. Rubin
United States District Judge